

# COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

## NO. 02-14-00134-CV

IN THE INTEREST OF A.O., A CHILD

----------

FROM THE 323RD DISTRICT COURT OF TARRANT COUNTY
TRIAL COURT NO. 323-98391J-13

----------

## MEMORANDUM OPINION[1]

----------

## I. Introduction

In three issues, Appellant Mother appeals the termination of her parental rights to her child A.O.  We affirm.

## II. Factual and Procedural Background

A.O. and Mother both tested positive for methamphetamine when A.O. was born on April 4, 2013.  A.O. was released from the hospital the next day to a maternal aunt before being transferred into a parent-child safety placement with

---

[1]See Tex. R. App. P. 47.4.

Mother's cousin. The Department of Family and Protective Services (DFPS) filed its petition for protection of the child, for conservatorship, and for termination of parental rights with regard to A.O. around a month after his birth. DFPS's supporting affidavit alleged that the child had tested positive for methamphetamine, that Mother had tested positive for methamphetamine when she visited the child, and that Mother's cousin had notified CPS that she was no longer able to provide a voluntary placement because Mother posed a risk of harm to her family and did not respect the boundaries she had tried to set. A.O. was taken into foster care.

DFPS gave Mother a service plan that required her to participate in individual counseling; to obtain and maintain safe, stable, and appropriate housing; to comply with all requests for random drug testing; to refrain from involvement in criminal activities and illegal acts, including illegal drugs; to maintain steady and legal employment and demonstrate the ability to meet the child's financial needs with proof of employment; to actively engage in parenting classes; and to attend visits with A.O. On January 24, 2014, the trial court granted Mother a continuance until April 2, 2014, so that she could try to complete her service plan.

Pam Chick, a family-based safety services (FBSS) worker who was initially assigned to Mother's case; Terica Brager, the Child Protective Services (CPS) supervisor assigned to Mother's case; and Denise Hamilton, the CPS caseworker assigned to Mother's case, testified at the termination trial on April 2,

2014. Mother did not appear at the termination trial, and the trial court denied her appointed counsel's oral request for a continuance.[2]

Around two weeks after A.O.'s birth, Mother told Chick that she had used methamphetamine five or six months before A.O. was born and that she had used it on and off for most of her life from a young age. On April 30, 2013, Mother told Chick that the last time she had used marijuana was around two months into her pregnancy and that she had used methamphetamine once after A.O. was born on April 4.

On May 3, 2013, Mother's cousin returned A.O. to CPS and refused to take him back because the police were called after Mother went to her house, banged on the door, and screamed to be let in. Mother had also made harassing and threatening phone calls to her cousin. Mother tested positive for methamphetamine on May 3, and A.O. was placed into foster care because there were no other family options with whom to place him.

Hamilton said that Mother admitted having used methamphetamine a week or two before her July 18, 2013 visit with A.O., and Brager said that on December 19, 2013, Mother told her that she had used methamphetamine two weeks earlier. Mother did not have a visit with A.O. scheduled for December 19, but

---

[2]Mother's counsel informed the trial court that he did not know why Mother was not at trial. Hamilton subsequently testified that Mother had a pending warrant out for her arrest for violating her community supervision. She also testified that Mother had called her the day before trial and did not say anything about coming to court even though Mother knew about the trial.

3

she went to the CPS office to tell Brager that she had found a potential caregiver for A.O. Brager warned Mother at that time that because Mother had not had any drug treatment, DFPS would not be able to recommend that A.O. be returned to her—Mother's trial was originally scheduled for January 23, 2014, a month later.

Hamilton stated that when CPS ran a background check on Mother's proposed placement, they discovered that he had a criminal history and so could not place A.O. with him. On January 30, 2014, Mother admitted to Hamilton that she had used methamphetamine around December 30, 2013. Hamilton stated that it concerned her that Mother had admitted on multiple occasions to using methamphetamine because "[c]ontinued drug use can lead to bad choices, bad decisions, [and] bad parenting for [A.O.]." Mother's March 5, 2014 drug test was positive for methamphetamine and amphetamine.

The trial court admitted a certified copy of an October 23, 2013 deferred adjudication order in which Mother pleaded guilty to committing the state-jail-felony offense of unauthorized use of a vehicle on or around August 23, 2013, around three months after A.O. had been removed from her. Mother pleaded guilty to the offense in exchange for five years' deferred adjudication community supervision, a $500 fine, $11,500 in restitution, and various other terms and conditions. The trial court also admitted certified copies of Mother's February 21, 2007 and June 26, 2013 judgments of conviction for misdemeanor possession of marijuana. Mother's more recent misdemeanor possession offense occurred on

4

or around January 30, 2013, and she pleaded guilty in exchange for a $100 fine and ten days' confinement.

Hamilton expressed concern that Mother would commit a felony offense while A.O. was in foster care because it showed a lack of interest in the child. Hamilton stated, "She knows she could get in trouble. She could possibly face prison time or any time, and then her child would kind of be left out." In October 2013, Mother spent around two weeks in jail for her state jail felony offense, and at the time of the termination trial, she had a warrant out for her arrest based on a violation of her community supervision. At the time of the termination trial, Mother had also been charged with committing failure to identify on or around February 16, 2014.

Hamilton said that Mother had visited A.O. at least seven times since the beginning of 2014 but that Mother did not visit A.O. at all between July 19, 2013, and December 31, 2013. Mother also cancelled the visit scheduled for the week before the trial. Hamilton stated that this concerned her because it also showed a lack of interest in the child. Mother never started any of her service plan requirements other than visits with the child despite constant encouragement from Hamilton.

Hamilton said that Mother had never been able to give CPS more than just a first name for the child's alleged father and that Mother had not demonstrated during the case that she could meet A.O.'s emotional and physical needs now or in the future. During Mother's visits with A.O., she would become agitated when

5

A.O. cried and would "want to end the visit really quickly," and "[e]ven now she shows a little agitation when, you know, he won't do something." Hamilton stated that Mother otherwise interacted pretty well with A.O. Mother lived "off and on with a guy" who had other people also staying with him, and Hamilton did not recommend that situation as safe and stable housing for A.O.

Hamilton testified that A.O. was doing well: "He's walking. He smiles. He plays." Hamilton stated that A.O.'s foster mother's home was safe and stable and that his foster mother had more than adequate parenting skills and abilities. Hamilton recommended terminating Mother's parental rights to A.O. as in his best interest, to give him stability and permanency. DFPS's plan was for A.O. to be adopted by his foster mother, who was present at the termination trial.

When the termination trial concluded, A.O.'s ad litem attorney joined with DFPS in requesting that Mother's parental rights be terminated. The trial court terminated Mother's parental rights to A.O., finding that she had knowingly placed or knowingly allowed A.O. to remain in conditions or surroundings that endangered his physical or emotional well-being, that she had engaged in conduct or knowingly placed A.O. with persons who engaged in conduct that endangered his physical or emotional well-being, and that termination of her parental rights to A.O. was in A.O.'s best interest. *See* Tex. Fam. Code Ann. § 161.001(1)(D), (E), (2) (West 2014). This appeal followed.

### III.  Termination of Parental Rights

In her first and second issues, Mother challenges the legal and factual sufficiency of the evidence to support the trial court's endangerment findings under section 161.001(1)(D) and (E).  In her third issue, she argues that the evidence is factually insufficient to support the trial court's best interest finding.

### A.  Standards of Review

In proceedings to terminate the parent-child relationship brought under section 161.001 of the family code, the petitioner must establish one ground listed under subsection (1) of the statute and must also prove that termination is in the best interest of the child.  Tex. Fam. Code Ann. § 161.001; *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005).  Both elements must be established; termination may not be based solely on the best interest of the child as determined by the trier of fact.  *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987).

Termination decisions must be supported by clear and convincing evidence.  Tex. Fam. Code Ann. §§ 161.001, .206(a) (West 2014).  Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established."  *Id.* § 101.007 (West 2014).  Due process demands this heightened standard because termination results in permanent, irrevocable changes for the parent and child.  *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002); *see In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007) (contrasting standards for termination and modification).

In evaluating the evidence for legal sufficiency in parental termination cases, we determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction that the grounds for termination were proven. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). We review all the evidence in the light most favorable to the finding and judgment. *Id.* We resolve any disputed facts in favor of the finding if a reasonable factfinder could have done so. *Id.* We disregard all evidence that a reasonable factfinder could have disbelieved. *Id.* We consider undisputed evidence even if it is contrary to the finding. *Id.* That is, we consider evidence favorable to termination if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *Id.* We cannot weigh witness credibility issues that depend on the appearance and demeanor of the witnesses, for that is the factfinder's province. *Id.* at 573, 574. And even when credibility issues appear in the appellate record, we defer to the factfinder's determinations as long as they are not unreasonable. *Id.* at 573.

In reviewing the evidence for factual sufficiency, we give due deference to the factfinder's findings and do not supplant the judgment with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We determine whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that the parent violated a subsection of section 161.001(1) and that the termination of the parent-child relationship would be in the best interest of the child. Tex. Fam. Code Ann. § 161.001; *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). If, in light of the

8

entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient. *H.R.M.*, 209 S.W.3d at 108.

Further, with regard to the best interest finding, while there is a strong presumption that keeping a child with a parent is in the child's best interest, *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006), prompt and permanent placement of the child in a safe environment is also presumed to be in the child's best interest. Tex. Fam. Code Ann. § 263.307(a) (West 2014). We review the entire record to determine the child's best interest. *In re E.C.R.*, 402 S.W.3d 239, 250 (Tex. 2013). The same evidence may be probative of both the subsection (1) ground and best interest. *C.H.*, 89 S.W.3d at 28; *see E.C.R.*, 402 S.W.3d at 249.

Nonexclusive factors that the trier of fact in a termination case may use in determining the best interest of the child include:

(A)   the desires of the child;

(B)   the emotional and physical needs of the child now and in the future;

(C)   the emotional and physical danger to the child now and in the future;

(D)   the parental abilities of the individuals seeking custody;

(E)   the programs available to assist these individuals to promote the best interest of the child;

(F)   the plans for the child by these individuals or by the agency seeking custody;

9

(G)     the stability of the home or proposed placement;

(H)     the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and

(I)     any excuse for the acts or omissions of the parent.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976).  These factors are not exhaustive; some listed factors may be inapplicable to some cases; other factors not on the list may also be considered when appropriate.  *C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may be sufficient in a particular case to support a finding that termination is in the best interest of the child.  *Id.*  On the other hand, the presence of scant evidence relevant to each factor will not support such a finding.  *Id.*

## B. Analysis

Mother argues that despite both A.O.'s testing positive for methamphetamine when he was born and Mother's continued drug use during the pendency of the case, DFPS did not prove that she had endangered the child because there was no evidence of how the drug use affected A.O. when the child never lived with Mother.  Mother further argues that despite an active warrant for her arrest at the time of the trial, there was no evidence that the child was present when an offense was committed or how Mother's committing a violation of her community supervision could endanger the child in any way.

A parent's endangering conduct need not be directed at the child or cause the child to actually suffer injury.  *Boyd*, 727 S.W.2d at 533; *In re J.T.G.*, 121

10

S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.). To the contrary, "endanger" under section 161.001(1)(E) means that the parent's voluntary, deliberate, and conscious course of conduct—including her acts and failures to act—directly resulted in exposing the child to loss or injury. *See Boyd*, 727 S.W.2d at 533; *J.T.G.*, 121 S.W.3d at 125; *see also* Tex. Fam. Code Ann. § 161.001(1)(E). The specific danger to the child's well-being may be inferred from parental misconduct alone. *See Boyd*, 727 S.W.2d at 533. As a general rule, conduct that subjects a child to a life of uncertainty and instability endangers the child's physical and emotional well-being. *In re R.W.*, 129 S.W.3d 732, 739 (Tex. App.—Fort Worth 2004, pet. denied). Further, a mother's use of drugs during pregnancy may amount to conduct that endangers the physical and emotional well-being of the child. *J.T.G.*, 121 S.W.3d at 125 (citing *In re K.M.B.*, 91 S.W.3d 18, 25 (Tex. App.—Fort Worth 2002, no pet.)). Drug addiction and its effect on a parent's life and ability to parent may also establish an endangering course of conduct. *Id.* at 125–26 (citing *Dupree v. Tex. Dep't of Protective & Regulatory Servs.*, 904 S.W.2d 81, 84 (Tex. App.—Dallas 1995, no writ)).

Conduct that routinely subjects a child to the probability that he will be left alone because the parent is once again jailed, whether because of violating community supervision or because of a new offense arising out of the continued use of illegal drugs, endangers both the child's physical and emotional well-being. *See In re S.D.*, 980 S.W.2d 758, 763 (Tex. App.—San Antonio 1998, pet. denied). A child's emotional well-being can also be negatively affected when a

11

parent repeatedly commits criminal acts that subject her to incarceration that results in her absence from the child's life and inability to provide support, thus creating an emotional vacuum in the child's life and subjecting the child to ongoing uncertainty regarding who will care for him. *In re S.L.-E.A.*, No. 02-12-00482-CV, 2013 WL 1149512, at *8 (Tex. App.—Fort Worth Mar. 21, 2013, pet. denied) (mem. op.).

The record establishes that Mother had used methamphetamine for most of her life, including while pregnant with A.O. and during the pendency of the case. She also used marijuana while pregnant with A.O., committed a state-jail felony—and had been charged with a failure-to-identify offense—while the case was pending, and had an active warrant for violating her community supervision. Even though Mother was warned that DFPS would not be able to recommend that A.O. be returned to her because she had failed to undergo any drug treatment, after Mother received a continuance of the trial date, she continued to use methamphetamine and failed to work on her service plan.

Reviewing the record in the light most favorable to the finding and judgment, we conclude that because the factfinder could have reasonably formed a firm belief or conviction that Mother's drug use and criminal activities subjected A.O. to a life of uncertainty and instability that would endanger his physical and emotional well-being, we overrule this portion of Mother's second issue with regard to subsection (E). *See J.P.B.*, 180 S.W.3d at 573; *R.W.*, 129 S.W.3d at 739. Reviewing the record under the factual sufficiency standard, we conclude

12

that the evidence also supports termination under subsection (E), and we overrule the remainder of Mother's second issue. *See H.R.M.*, 209 S.W.3d at 108; *cf. In re D.T.*, 34 S.W.3d 625, 640 (Tex. App.—Fort Worth 2000, pet. denied) (op. on reh'g) (holding the evidence factually insufficient to support endangerment by course of conduct when, among other things, Mother complied as fully as possible with the goals and objectives required to facilitate reunification with her son). Based on our resolution of Mother's second issue, we do not reach her first issue. *See* Tex. R. App. P. 47.1; *In re E.M.N.*, 221 S.W.3d 815, 821 (Tex. App.—Fort Worth 2007, no pet.) (stating that along with the best interest finding, a finding of only one ground alleged under section 161.001(1) is sufficient to support a judgment of termination).

With regard to her third issue on the trial court's best interest finding, Mother argues that there was no direct evidence offered with regard to the child's desires, any special physical or emotional needs of the child, or any direct evidence to support the notion that A.O. was ever in physical or emotional danger due to her drug use or that Mother was incapable of recovering from her drug use. Mother further argues that there was no specific evidence regarding her parental abilities and no evidence that she used illegal drugs in the child's presence or in a manner that could bring harm to him. She complains that instead, there was evidence that she interacted well with A.O., that she made multiple attempts to have the child placed with family members and others she knew "in an effort to ensure that the child had a safe living environment during

13

the pendency of the case," and that she had located a family that was willing to have A.O. placed in their home.

Contrary to Mother's arguments here, not all *Holley* factors will be applicable in every case. *See C.H.*, 89 S.W.3d at 27. Further, we have already addressed that Mother's conduct endangered A.O. in our discussion above, and A.O., who was two days short of his first birthday at the time of the termination trial, would have been incompetent to testify about his desires.[3] Notwithstanding Mother's seven visits with the child since January 2014, her drug use, inability to provide a stable home, and failure to comply with her service plan all support the finding that termination is in the child's best interest. *See In re M.R.*, 243 S.W.3d 807, 821 (Tex. App.—Fort Worth 2007, no pet.); *see also In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009) (stating that a recent, short-term improvement does not conclusively negate the probative value of a long history of drug use and irresponsible choices). In contrast, A.O.'s foster mother attended the trial, and Hamilton testified that the foster placement had a safe and stable home for the child, more than adequate parenting skills and abilities, and wanted to adopt A.O. Therefore, we conclude that the evidence is factually sufficient to support the trial court's best interest finding, and we overrule Mother's third issue.

---

[3]At the conclusion of the trial, A.O.'s ad litem attorney joined with DFPS in seeking to terminate Mother's parental rights, pointing out that there was no evidence to show that Mother could take care of or support the child, that she was drug-free, or that she had stable housing and that there was evidence to the contrary. Hamilton testified that she had seen A.O. smiling and playing while in foster care and that he was doing well there.

## IV.  Conclusion

Having overruled Mother's dispositive issues, we affirm the trial court's judgment.

PER CURIAM

PANEL:  MCCOY, J.; LIVINGSTON, C.J.; and GABRIEL, J.

DELIVERED:  August 14, 2014